Paul JENNINGS and International Union of Electrical, Radio and Machine Workers, AFL–CIO, Plaintiffs,

George Meany et al., Plaintiffs-Intervenors,

v.

John B. CONNALLY, Chairman,* et al., Defendants.

Civ. A. No. 226–72.

United States District Court, District of Columbia.

July 14, 1972.

---

* Since the filing of this action, John B. Connally resigned as Secretary of the Treasury and George P. Shultz was appointed to that office. The Secretary of the Treasury serves also as Chairman of the Cost of Living Council. Caspar Weinberger succeeded Mr. Shultz as Director of the Office of Management and Budget and ex officio became a member of the Council. See Executive Order 11640, 37 Fed.Reg. 1213, Jan. 27, 1972.

**410**

Richard Scupi, Washington, D. C., for plaintiffs.

J. Albert Woll, Washington, D. C., General Counsel, AFL–CIO, Thomas E. Harris, Washington, D. C., Associate General Counsel, AFL–CIO, Albert Gore, Solomon I. Hirsh, Chicago, Ill., for

Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO.

Robert Eliot Easton, Stanley D. Rose, U. S. Dept. of Justice, Washington, D. C., for defendants.

Laurence J. Cohen, Washington, D. C., for Congressman William F. Ryan, amicus curiae.

## OPINION

WILLIAM B. JONES, District Judge.

On August 15, 1971, the President issued Executive Order 11615[1] which placed a ninety-day freeze on wages and prices in the United States. The legal basis for establishing these controls was the Economic Stabilization Act of 1970, as amended, 12 U.S.C. § 1904 note (1970). Executive Order 11615 established the Cost of Living Council (COLC), delegated to it the President's powers under the law, and authorized COLC to delegate any of its powers.

Wage controls for the period beginning November 14, 1971 (Phase II), were authorized by Executive Order 11627, issued on October 15, 1971.[2] This order continued the Council and established the Pay Board to perform such functions with respect to the stabilization of wages and salaries as the Council delegates to the Board. On the same day, the Council issued an order delegating to the Pay Board authority to:

> establish criteria, standards, and implementation procedures designed to stabilize wages and salaries within the general economic stabilization goals and coverage determination developed by the Council.[3]

On November 13, 1971, the Council and the Pay Board issued initial Phase II wage control regulations. The Pay Board's regulations in effect since that time have provided that aggregate first-year wage increases for employees under newly adopted collective bargaining agreements are limited to 5.5% of existing wage levels except where specific

---

1. 36 Fed.Reg. 15727 (Aug. 17, 1971).

2. 36 Fed.Reg. 20139 (Oct. 16, 1971).

3. COLC Order No. 3, 36 Fed.Reg. 20202 (Oct. 15, 1971).

approval for a larger increase is administratively granted.[4]

On December 22, 1971, Congress amended the Economic Stabilization Act.[5] Section 203(d) of the Act, as amended, provides:

> (d) Notwithstanding any other provisions of this title, this title shall be implemented in such a manner that wage increases to any individual whose earnings are substandard or who is a member of the working poor shall not be limited in any manner, until such time as his earnings are no longer substandard or he is no longer a member of the working poor.

On January 29, 1972, COLC determined that hourly wages under $1.90 were exempted from wage increase controls by Section 203(d) of the Act.[6]

Plaintiffs brought this action seeking a declaratory judgment that COLC's ruling that wages under $1.90 per hour are exempt from control under the Act is in excess of agency authority and therefore unlawful. Plaintiffs also seek to enjoin application of that regulation to them in their negotiations with employers in behalf of the members of their unions. Plaintiffs here include not only Paul Jennings and the International Union of Electrical, Radio and Machine Workers, AFL–CIO, but also George Meany and the American Federation of Labor and Congress of Industrial Organizations and the Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO, whose motions to intervene as plaintiffs were granted by order of this Court, dated April 18, 1972.

The parties in this action have filed cross-motions for summary judgment. Having considered the memoranda and affidavits and the statements submitted in accord with Local Rule 9(h) in support of those motions, the Court finds. that there are no material facts genuinely in dispute and that summary judgment is appropriate àt this juncture in accord with the conclusions of law discussed below.

Two questions are presented to the Court in this case:

1. Whether Section 203(d) requires the President, or his delegates (COLC), to exempt from wage controls "all persons whose earnings are at or below levels established by the Bureau of Labor Statistics in determining an income necessary to afford adequate food, clothing and shelter and similar necessities."[7]

2. Whether the President (COLC) has any discretion under Section 203(d), and if so, whether that discretion has been abused in exempting from wage controls those individuals whose earnings are below $1.90 per hour.

---

4. Pay Board Regulations, §§ 201.10, 201.11, 36 Fed.Reg. 21790 (Nov. 13, 1971), 36 Fed.Reg. 25427 (Dec. 31, 1971).

5. Pub.L. 92–210, 85 Stat. 743.

6. COLC Regulations, § 101.104 provide:
   Notwithstanding the provisions of this title, this title shall be implemented in such a manner that pay adjustments to any individual who is paid at a rate of less than $1.90 per hour shall not be limited in any manner until such time as the earnings of such individuals are no longer less than $1.90 per hour. 37 Fed.Reg. 3913 (Feb. 24, 1972).
   Before COLC issued its $1.90 per hour ruling on January 29, 1972, it had on January 10th requested the views of the Pay Board on the appropriate exemption level. On January 19, 1972, the Pay Board adopted the following resolution:
   It is the sense of the Pay Board that the $1.90 figure recommended by the Cost of Living Council is inconsistent with the purposes of the Amendments to the Economic Stabilization Act and supporting analysis. Pay Board Release, PB–39.
   Under Executive Order 11640, supra note 1, however, it was the province of COLC, rather than the Pay Board, to make the final administrative determination as to exemption from wage controls under the Act.

7. H.R.Rep. 92–714, 92d Cong., 1st Sess. 5 (1971), 117 Cong.Rec. H. 12163 (Daily ed. Dec. 9, 1971).

I.

In order to address the first question presented above, whether Congress has provided a mandatory level for exemption from wage controls, it is necessary to consider the terms of the statute itself and the legislative history of the provision in question.

The terms of Section 203(d), *supra*, do not specify any particular level of individual earnings, either annual or hourly, which must be exempt from controls. Absent the legislative history of Section 203(d), one might conclude that the terms of the statute alone indicate a Congressional intent to leave the application of those terms ultimately within the discretion of the President (COLC). Such an interpretation would incorporate the more explicit references in the legislative history of Section 203(d) as mere guidelines or suggestions on the part of Congress to help inform the discretion of the President. That in short is the position of the defendants in this case, and they cite particularly Sections 202 and 203(a) of the Amendments in support of Executive discretion.

▉▉ The statute does indeed confer upon the Executive broad discretion in implementing the purposes of the Economic Stabilization Program. Section 203(d), however, does not present the only limitation upon that discretion. Sections 203(c) through (g) present several specific mandatory exemptions from controls. Where provision is made for Executive discretion in implementing those sections, it is generally limited to a determination that a specific agreement as to wages or benefits is unreasonably inconsistent with the purposes of the Act.

As to the specific exemption from wage controls granted in Section 203(d), an additional indication of Congressional intent to limit Executive discretion in implementing that section can be found in the introductory clause of the provision, which begins: "Notwithstanding any other provision of this title. . . ." Those words would be superfluous unless they refer to those sections of the Act which confer upon the Executive broad discretion in implementing the purposes of the Act.

Apart from the introductory clause of that section referred to above and the provision that the exemption is to apply to "individuals," nothing else in the statute itself indicates that Congress intended to give its own definition of the terms "substandard earnings" and "working poor." For a more explicit statement of the intent of Congress, it is necessary to turn to the legislative history of Section 203(d).

The legislative history of Section 203(d) consists of the rejected Senate provision, brief commentary in the committee reports for the House and Senate versions of the Amendments and the conference report for the amendments in their final form.

Section 203(d), as enacted into law, is identical to the provision offered in H.R. 11309, the House version of the amendments to the Act. In summarizing H.R. 11309, the report of the House Committee on Banking and Currency stated:

> This section forbids the President, under the authority granted by this title, from regulation or otherwise restricting the wages of the working poor or persons whose earnings are otherwise substandard. It is the intention of the Committee that this exemption from control apply to all persons whose earnings are at or below levels established by the Bureau of Labor Statistics in determining an income necessary to afford adequate food, clothing and shelter and similar necessities.[8]

The Senate version of the proposed amendments, S. 2891, included a section similar to Section 203(d); the Senate bill provided:

> No order or regulation issued under this section shall apply to the wages or salary of any individual receiving substandard earnings. The President shall prescribe regulations defining

8. *Id.*

for purposes of this subsection the term 'substandard earnings.' In no case shall such term be defined to mean earnings less than those resulting from a wage or salary rate which yields, on an annual basis, an income below the poverty level for a family of four (or an appropriated [sic] equivalent in the case of workers employed in parttime or seasonal occupations) as prescribed annually by the Office of Management and Budget.[9]

The House-Senate Conference Committee accepted the House version of Section 203(d); its report states:

The House bill provided that wage controls will not apply to individuals whose wages are substandard or to the working poor. The Senate bill contained similar language except that the term 'working poor' was not included. Moreover, the Senate bill defined substandard earnings to mean no less than those prescribed as the poverty level by the Office of Management and Budget. The Conferees agreed to the House provision.[10]

█ The legislative history quoted above certainly does not provide a categorical statement of Congressional intent. What emerges from an examination of those sources is a composite picture of legislative intent. Since the House version of Section 203(d) prevailed in conference, the report of the House committee must be read with that of the conference committee. Thus the following points of Congressional intent are clear:

1. Section 203(d) "forbids the President . . . from regulation or otherwise restricting the wages of the working poor or persons whose earnings are otherwise substandard." [11]

2. The exemption from wage controls is intended to apply to "all persons whose earnings are at or below levels established by the Bureau of Labor Statistics in

determining an income necessary to afford adequate food, clothing and shelter and similar necessities." [12]

3. Congress rejected poverty-level earnings as prescribed annually by the Office of Management and Budget as a yardstick for determining exemption from wage controls.

One additional indication of Congressional intent should be noted. On January 18, 1972, Representative Wright Patman, Chairman of the committee which reported out H.R. 11309, wrote to the Pay Board after the Board had solicited his views on the intent of Congress in Section 203(d). In that letter, which is part of the record in this case, Congressman Patman stated the following:

Legislative history was made on this point during the debate in the House by Congressman Ryan of New York. As a result, it is clear that it was the intention of the House when it adopted this provision that the working poor constituted a family of four living in an urban area of 2,500 population or more and having an annual income of $6,960. or less. It is the only statement contained in the floor debate going to substandard wages and the working poor and therefore must stand as a definition for these terms in the bill.

\* \* \* \* \* \*

It is the clear intention of Congress that the authority of this Act should not be used to penalize wage earners by retarding progress toward achievement of an adequate standard of living. Certainly that standard of adequacy cannot begin much before the $7,000. income level is reached. Granted, this would leave the income of a large number of the nation's workers unregulated under the Act, but by the same token, no one is arguing that the wages received by

9. S. 2891, 117 Cong.Rec. S. 1992 (daily ed. Dec. 1, 1971).

10. H.R.Rep. 92-745, 92d Cong., 1st Sess. 17-18 (1971), 117 Cong.Rec. H. 12361 (daily ed. Dec. 13, 1971).

11. H.R.Rep. 92-714, supra note 7.

12. *Id.*

these people and the wage increases granted to them constitute a major element in the inflationary conditions that prevailed before implementation of Phase I.

■ The legislative history of Section 203(d) makes it clear that Congress requires an exemption from wage controls for individuals whose earnings are below budget levels established by the Bureau of Labor Statistics (BLS). This Court cannot adopt COLC's position that the legislative history merely "suggests usage of the Bureau of Labor Statistics 'lower-budget' figure" and that several approaches were open to it in defining the exemption for the working poor, including "consideration of the Office of Management and Budget 'poverty-line' figure of $3,968 per year."[13]

Congress advisedly set a level of exemption from wage controls higher than the "poverty-line" figure which has been developed by the Office of Management and Budget and "used by the Office of Economic Opportunity and other governmental agencies in administering Federally sponsored poverty programs."[14] The Economic Stabilization Act, as amended, does not establish or otherwise affect any welfare or poverty

programs. The purpose of the Act, as announced in Section 202, is "to stabilize the economy, reduce inflation, minimize unemployment, improve the Nation's competitive position in world trade, and protect the purchasing power of the dollar. . . ."[15] It was not necessary to freeze workers at the poverty level in order to carry out the stated aims of the Act. Congress showed that its intent was otherwise specifically providing a higher level of exemption from wage controls.[16]

## II.

■ The second question presented in this case is: whether the Executive has any discretion under Section 203(d), and if so, whether that discretion has been abused in exempting from wage controls those individuals whose earnings are below $1.90 per hour. Unquestionably, the Executive must have some discretion in implementing administratively the broad directive of Congress in Section 203(d). Congress has not pre-empted all exercise of discretion with any detailed definitions of the crucial terms of that provision. But Congress has provided a mandatory level of exemption

13. COLC News Release, CLC–67, Jan. 29, 1972.

14. *Id.*

15. Pub.L. 92–210, § 202 (Dec. 22, 1971), 85 Stat. 744.

16. In fact, there is evidence in the record to indicate that even the higher level of exemption provided by Congress, the so-called "lower budget level" for families established by BLS, may be a more realistic approximation of a poverty-line budget than the figure developed by the Office of Management and Budget. *See*, Remarks of Cong. William F. Ryan of New York during the debate on H.R. 11309, 117 Cong.Rec. H. 12249–12251 (daily ed. Dec. 10, 1971).

Congressman Ryan, whose remarks during debate on H.R. 11309 provide the only statement from the floor on Section 203 (d), urged the House conferees to insist upon the higher level of exemption contained in the House bill. Addressing his

remarks to the relationship between the higher exemption level in the House bill and the purposes of the Economic Stabilization Act, Congressman Ryan said:

Not just from the point of view of equity but from the point of view of the overall economy, it makes good sense to allow the wages of the working poor to rise to the point where they are not substandard. These workers of necessity spend a very great percentage of their total income. Thus, this money is pumped into the economy, stimulating aggregate demand. This in turn helps the GNP to rise. For, in order to put this economy back on its feet, the GNP must rise substantially, in order to cut unemployment. *Id.* at H. 12251.

Congressman Ryan made substantially the same statement in testifying before the House Committee considering the amendments to the Act. *See* Hearings on H.R. 11309 Before the House Committee on Banking and Currency, 92d Cong., 1st Sess. at 445 (1971).

which should not be undermined in the interest of administrative convenience.

█ In implementing Section 203(d), it was clearly within Executive discretion to make any reasonable adjustments to the exemption level intended by Congress which would reflect current revisions in the budget levels established by BLS. Thus, COLC noted that the BLS lower budget figure required for an urban family of four had been estimated at $6,960. per annum for the Spring of 1970. In order to reflect the increases in cost-of-living between April 1970 and November 1971 (the last month for which the Council had statistics available), the lower budget figure was adjusted upward $372. to a total of $7,332. per annum. An average increase in Social Security taxes of $26.00 per annum since the Spring of 1970 was also noted, and the Council likewise adjusted the lower budget figure upward to a total of $7,358. per annum.

The Council then made several adjustments downward in the BLS lower budget level, producing a net reduction of $2,715. per annum. The Council's explanation for each of these adjustments, however, raises the question whether any of them has a sufficiently rational basis.

The Council first observed that the BLS budget figure of $6,960. is based on annual expenses for an urban family of four having a single wage earner aged 35 to 54. The affidavit of Dr. Marvin H. Kosters, Assistant Director for Planning and Analysis, whose staff was primarily responsible for the economic analysis upon which the COLC based the ruling in question here, stated that the BLS has developed comparable estimates for families whose head is aged 35 or under ($5,481. per annum) and 55 to 64 ($8,074. per annum). The affidavit goes on to say that an average was taken of these estimated budget figures ($5,481.; $6,960.; $8,074.), weighted according to the distribution of family heads in the population falling in the same age categories. This calculation was based on data provided in the Bureau of Census publication, Income in 1970 of Families and Persons in the U. S., Series P-60, No. 2, March 23, 1971. The result was an income or budget level of $6,651. per annum. There is no indication, however, that the three budget figures estimated above had been adjusted for cost-of-living increases.

Thus, the Council reduced by $681. the lower budget level which it had at first raised from $6,960. to $7,332., in recognition of cost-of-living increases since the $6,960. figure had first been developed. But the $681. reduction was based on three estimated budget figures which apparently had not been adjusted for cost-of-living increases.

The Council further reduced the lower budget level by $206. in recognition of reductions in Federal income taxes for families of four whose income is below $7,000. per annum. These reductions in taxes, however, are first applicable during 1972. It is somewhat inconsistent to make adjustments for reduced taxes in 1972 but not for cost-of-living increases that could reasonably be expected in 1972. Recognition of such increases by COLC was based on data for 1971, the latest data available according to COLC at the time of the ruling in question here. But increases in cost-of-living have been watched closely for years. Surely an average annual increase could be estimated based on the accumulation of data from past years. Even a conservative allowance for projected cost-of-living increases for 1972 would have been more consonant with the intention of Congress than complete disregard of such likely increases. If COLC chose to anticipate tax reductions effective in 1972, then in the interest of consistency it should have made some allowance as well for estimated cost-of-living increases in 1972.

The Council made a further reduction of $555. in the BLS lower budget level and based this adjustment on Census Bureau statistics which show that average family size is 3.6 rather than 4 as

reflected in BLS calculations.[17] Plaintiffs, however, point out that the 3.6 average is based on data that includes some 7,178,000 families in which the head of the family is age 65 or over and presumably retired. Families in this age bracket also presumably have fewer members on the average and fewer dependents on a primary wage earner. Plaintiffs contend that the average family size in families whose head is under age 65 is 3.8. And in the age group of 30 to 35 (5,164,000 families) average family size is 4.4; in the age bracket of 35 to 44 (10,884,000 families) average family size is 4.7; and in the age bracket of 45 to 54 (10,829,000 families) average family size is 3.8.[18] The foregoing data indicate that the BLS estimate of average family size of four persons is sound and that if an adjustment were really necessary, an average of 3.8 would be more reasonable than 3.6 persons per family.

By far COLC's most drastic reduction in the lower budget level resulted from its determination that the average number of wage earners in all families in the United States is 1.7.[19] Thus, COLC took the lower budget figure remaining after the adjustments described above, made one further adjustment upward in recognition of the increased expenses connected with the extra .7 wage earner in each family, and divided the remaining figure by 1.7. The result was a determination that an income of $3,962. per annum is required by a single wage earner in order to meet the lower budget estimated by BLS. Dividing that amount by an assumed 2,080 hours worked per year gives an hourly wage rate of $1.90.

COLC's estimate of 1.7 wage earners per family is based on data for all families regardless of their annual income. Plaintiffs contend that the data used by COLC actually shows 1.68 and not 1.7 persons per family receiving income and that the term "income" includes earnings other than wages. In addition, plaintiffs have submitted under affidavit several tables derived from the same source used by COLC [20] upon which they base a lower estimate of average wage earners in low-income families.

Plaintiff's tables indicate the following:

1. 7,413,000 families that had one earner in 1970 had family incomes less than $7,000.

2. 3,063,000 families that had one earner in 1970 had family incomes less than $4,000. Under the COLC ruling, only these families would be exempt from wage controls. Thus, at least 4,350,000 families with one earner whose income was less than $7,000 (approximately the level of exemption intended by Congress) would *not* be exempt from wage controls under COLC's present ruling.

3. The average number of earners per family in families with incomes of less than $7,000. is 1.09.

4. The average of 1.7 earners for all families in the United States, as determined by COLC, includes families with total income of $12,000 to $15,000 and an average of 1.98 earners per family, and families with $15,000 to $50,000 total income and an average of 2.33 earners per family.

Congress did not exempt all families from wage controls; it exempted individuals whose earnings are substandard and those who are members of the working poor. In determining who is entitled to an exemption, COLC's use of an average of 1.7 earners in all families in the United States, on the basis of the record in this case, is without a rational basis and frustrates the intent of Congress.

Two further assumptions made by COLC in determining the level of exemp-

---

17. *See* Income in 1970 of Families and Persons in the U.S., Bureau of the Census, Series P–60, No. 80 (Oct. 4, 1971).

18. *See* Population Characteristics: Household and Family Characteristics, Bureau of the Census Series, P–20, No. 218, at 46, Table 6 (March 23, 1971).

19. *See* Income in 1970 of Families and Persons in the U.S., supra note 12.

20. *Id.*

tion from wage controls at $1.90 per hour are challenged by plaintiffs. COLC ultimately reached its figure of $1.90 per hour by dividing $3,962 (the amount it determined necessary for an individual to meet the BLS lower budget level), by 2,080 working hours per year. Thus, COLC assumed a working year of 52 weeks at 40 hours per week.[21] Plaintiffs' data shows that not since 1948 have workers averaged 40 hours per week; not since 1956 have they averaged 39 hours per week; and not since 1967 have they averaged 38 hours per week. In 1970, the average work week was 37.1 hours, and preliminary estimates for 1971 indicate an average work week of 37 hours.[22]

This Court recognizes the serious administrative problems facing COLC in translating the intention of Congress in Section 203(d) into a practicable and equitable standard of exemption from wage controls. The administrative problem here is particularly complicated since COLC based its determinations on data which was not specifically developed for the purposes of the Economic Stabilization Act. The Court cannot ignore, however, the cumulative effect of the assumptions and adjustments made by

COLC, as well as apparent inconsistencies in applying them, where the result clearly frustrates the intent of Congress.

Defendants cite other instances in which Congress and the Courts have sanctioned the use of average or general standards where any other method would be administratively infeasible.[23]

This Court does not question COLC's attempt to translate the intent of Congress in Section 203(d) into a standard of exemption based on hourly wage rates, applicable throughout the nation, regardless of family size. The Court does question, however, the assumptions of COLC in adjusting the level of exemption from controls downward from approximately $3.35 per hour to $1.90 per hour.

Defendants also contend that if the exemption level is set at approximately $7,000 per annum for all individuals, the result will be to exempt from controls over 50% of the nonsupervisory working force. If Congress had intended such a sweeping exemption, they argue, its intention to do so would have been more explicit. They cite as precedent for such action, the Defense Production Act of 1950.[24] That Act stabilized wages at the

---

21. COLC bases its assumption on data for 1967–68 reported in Handbook of Labor Statistics, U.S. Dept. of Labor, Bureau of Labor Statistics, at 152, Table 81 (1971).

22. *See* Employment and Earnings, U.S. Dept. of Labor, Bureau of Labor Statistics, Vol 18, No. 7, at 75, Table C–1, "Gross (Average Weekly) Hours of Production of Nonsupervisory Workers on Private Nonagricultural Payrolls." (Jan. 1972).
    Since COLC bases exemption from wage controls on hourly wage rates, the difference between a 37 and 40 hour average work week is significant. The lower average work week represents a reduction of 7.5% in hours worked. Thus, since COLC divides the income figure it determined necessary to meet the lower budget level of BLS by the number of hours worked per annum to reach the exemption level of $1.90 per hour, applying the lower average work week would raise the exemption level to $2.06 per

hour. More significantly, if the BLS budget figure of approximately $7,000. were divided by 1,924 hours worked per annum (37 hours per week) instead of 2,080 (40 hours per week), the exemption level would be raised from $3.31 per hour to $3.63 per hour.

23. The Federal minimum wage law, for example, sets one uniform hourly wage figure for the entire nation, regardless of differences in individual family size or regional costs of living. Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 et seq. (1970). Retired Federal employees pension plan payments are based on the Consumer Price Index, which is a national average. 5 U.S.C. § 8340 (1970). *See also*, Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944).

24. Pub.L. 774, 64 Stat. 798, Chap. 932, 81st Cong., 2d Sess., Sept. 8, 1950, as amended by Pub.L. 429, 66 Stat. 296, Chap. 530, 82d Cong., 2d Sess., June 30, 1952.

level then current. There was no specific dollar hourly wage mentioned in the original Act. When Congress amended the Act two years later, however, it specifically exempted earners of one dollar or less per hour from regulation under the Act. Although Congress could have expressly stated a specific hourly rate for exemption under Section 203(d) of the Economic Stabilization Act, it was certainly not required to do so. If it chooses to do so in the future, Congress may amend the law, as it did in the case of the Defense Production Act of 1950.

COLC's alarm at the prospect of an exemption from wage controls for over fifty percent of the nonsupervisory working force is less convincing in light of its recent ruling exempting small businesses from both price and wage regulations.[25] This exemption affects businesses with sixty or fewer employees except those with gross annual sales or revenues in excess of certain levels, those in the health and construction industries and those where more than fifty percent of the employees are affected by a master employment contract covering more than sixty workers. This exemption from regulation affects millions of employees in millions of small firms.[26] COLC authorized the exemption in order to eliminate the administrative burden which had arisen in regulating small businesses under the Act.[27] As authority for granting such an exemption, COLC relied on Section 214(b)(2) of the Act, which provides:

(2) in administering this title, such exemptions shall be provided for small business enterprises as may be feasible without impeding the accomplishment of the purposes of this title.

Neither the terms of Section 214(b)(2) of the Act nor the legislative history of that provision requires an exemption from regulation as specific as that required by Section 203(d) for low-wage earners. Millions of low-wage earners, however, have been denied the exemption from wage controls to which they are entitled because of the administrative difficulties in recognizing such exemptions. Yet COLC, in the interest of administrative convenience, has exempted millions of workers in small businesses, regardless of their annual or hourly income.

In light of the foregoing, this Court, pursuant to the authority granted in Sections 211(d)(1) and (e)(1)(A) of the Economic Stabilization Act of 1970, as amended, finds that COLC Regulation § 101.104, *supra*, setting wage rates of $1.90 per hour or less as the level of exemption from wage controls under Section 203(d) of the Act, is in excess of agency authority and is therefore unlawful. Application of this regulation is enjoined as to the plaintiffs and plaintiff-intervenors in this litigation, pursuant to Section 211(d)(2) of the Act.

25. COLC Regulations, § 101.51, 37 Fed. Reg. 8939 (May 3, 1972).

26. The exemption for small businesses affects approximately:
   "—5 million small firms (1.5 million small retail firms had previously been exempted from price controls)
   —Approximately $500 billion annual sales (28 percent of total annual sales)

—19 million employees (26 percent of payroll employment). It should be noted that a portion of these employees are already exempt under the exemption for employees earning less than $1.90 an hour." CCH Economic Controls: Stabilization Program Guidelines, ¶ 595.59 at 660 (May 3, 1972).

27. *Id.*