**Paul JENNINGS et al., Plaintiffs,**

v.

**George P. SHULTZ, Chairman, et al.,
Defendants.**

Civ. A. No. 226–72.

United States District Court,
District of Columbia.

March 1, 1973.

Richard Scupi, Washington, D. C., for plaintiffs.

Albert Gore, Chicago, Ill., Solomon I. Hirsh, Washington, D. C., for Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO.

J. Albert Woll, Gen. Counsel, AFL–CIO, Thomas E. Harris, Associate Gen. Counsel, AFL–CIO.

William E. Nelson, Stanley D. Rose, Dept. of Justice, Washington, D. C., for defendants.

## OPINION

WILLIAM B. JONES, District Judge.

On July 14, 1972, this Court in this action entered an order declaring unlawful defendants' regulation (Cost of Living Council Regulation § 101.104) setting wage rates of $1.90 per hour or less as the level of exemption from wage controls under Section 203(d) of the Economic Stabilization Act of 1970, as amended (Pub.L. 92–210, 85 Stat. 743). The same order enjoined the application of that regulation to the plaintiffs and plaintiff-intervenors, pursuant to Section 211(d)(2) of the Act. Jennings v. Connally, D.C. 347 F.Supp. 409.[1]

1. Since the July 14, 1972 order, John B. Connally resigned as Secretary of the Treasury and George P. Shultz was appointed to that office. The Secretary of the Treasury serves also as Chairman of the Cost of Living Council (COLC). Several other personnel changes have occurred in COLC, whose members serve ex officio from the executive positions listed in § 1(b) of Executive Order 11695,

Since the entry of that order a supplemental complaint and several motions have been filed, as set forth more fully below. The action of the President in early 1973 of removing most mandatory wage controls, however, has raised the issue of whether this case is now moot.

■ The establishment of the so-called "Phase III" by Executive Order 11695, 38 Fed.Reg. 1473 (Jan. 12, 1973), has not mooted the issues before the Court for decision in this case for two reasons. First, the regulations issued under that Order establish wage and price standards that are to be "applied voluntarily and on a self-administered basis." COLC Reg. § 130.11, 38 Fed. Reg. 1480 (Jan. 12, 1973). That voluntary compliance is to be judged by "[T]he policies and principles, including the computation methods," which were in effect at the end of "Phase II." COLC Reg. § 130.12, *id.* Thus the Phase II standards under challenge by the plaintiff and plaintiff-intervenor Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO, in this case still govern the administration of the current stage of the economic stabilization program, and this case cannot be considered moot. Second, the plaintiff-intervenor Meat Cutters in this action remains under mandatory wage controls pursuant to COLC Reg. § 130.-58, *id.* at 1483, and thus is still directly affected by the wage standards under challenge. As to that plaintiff-intervenor, this case certainly cannot be deemed moot. Therefore, the Court will now turn to the consideration of the substantive issues in this case.

Three days after the entry of the July 14, 1972 order, plaintiffs and plaintiff-intervenors filed a motion requesting an order placing a $3.35 hourly wage exemption level in effect until such time as COLC issued a new regulation setting a wage exemption level of at least $3.35 per hour.

On July 25, 1972, defendants (COLC) filed a motion requesting that the Court's July 14, 1972 order be amended or clarified to declare that that order had prospective effect only and that any new exemption level need not be applied retrospectively to the effective date of the $1.90 exemption.

Also on July 25, 1972, the Council amended Section 101.104 of its Regulations to provide that after July 14, 1972, the wages of any individual earning less than $2.75 an hour were to be exempt from the application of the controls of the Economic Stabilization Act, as amended, until such a time as the earnings of such individual are no longer less than $2.75 an hour. (37 Fed. Reg. 14998 (July 27, 1972).) On August 8, 1972, the Pay Board created by Executive Order (Section 7, Executive Order No. 11640), published a new regulation implementing the Council's $2.75 per hour exemption (6 C.F.R. § 201.11 (a)(9)).[2]

Following the $2.75 per hour exemption action by the Council and the Pay Board, plaintiffs and plaintiff-intervenor Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO (Meat Cutters) filed with leave of the Court on October 3, 1972, a supplemental complaint.[3] The supplemental complaint

---

38 Fed.Reg. 1473 (Jan. 12, 1973). Those changes in COLC membership, and thus defendants, are: Frederick B. Dent, successor to Peter Peterson as Secretary of Commerce; Peter Brennan, successor to James Hodgson as Secretary of Labor; James Lynn, successor to George W. Romney as Secretary of Housing and Urban Development; and Roy L. Ash, successor to Caspar Weinberger as Director of the Office of Management and Budget. In addition, the Secretary of Health, Education and Welfare, Caspar Weinberger, has been made a member. Finally, John

T. Dunlop has succeeded Donald Rumsfeld as Director of COLC, a named defendant.

2. The Pay Board was subsequently abolished by Executive Order 11695, 38 Fed. Reg. 1473 (Jan. 12, 1973), which established "Phase III" and vested the Pay Board's power in COLC.

3. Plaintiff-intervenors George Meany and American Federation of Labor and Congress of Industrial Organizations (AFL–CIO) did not join the other plaintiffs and plaintiff-intervenor Meat Cutters as parties to the supplemental complaint.

seeks to have declared the $2.75 per hour exemption unlawful and to have the Council and its delegee Pay Board enjoined from applying wage control regulations to the workers represented by plaintiffs and plaintiff-intervenor Meat Cutters with hourly wages of less than $3.85 until such time as a regulation lawfully implementing Section 203(d) of the Act, as amended, is issued.

And plaintiffs and plaintiff-intervenor Meat Cutters request that this Court preliminarily enjoin the application of wage controls as to them and the workers represented by them. Plaintiffs and plaintiff-intervenor Meat Cutters (hereafter collectively "plaintiffs") advance a two-fold argument for the equitable relief they seek. First, they assert that COLC in declaring a $2.75 per hour exemption limit on July 25, 1972, was acting arbitrarily and in excess of its statutory authority. Secondly, for this Court to merely declare such exemption limit unlawful would not be sufficient to grant plaintiffs the relief to which they are entitled and that, therefore, this Court's order should exempt, retrospectively as well as prospectively, plaintiffs and the working poor and substandard wage earners they represent from any wage controls until COLC promulgates a valid exemption regulation. As stated by the plaintiffs in their memorandum in support of their motion for a preliminary injunction, that motion involved all of the then pending motions and the supplemental complaint. Since that time, cross-motions for summary judgment have been filed, and the Court will consider all the prior motions as merged for decision into the cross-motions for summary judgment.

*The Cross-Motions for Summary Judgment*

In considering plaintiffs' challenge to the $2.75 per hour exemption limit, this Court, as it had stated in its earlier opinion, "recognizes the serious administrative problems facing COLC in translating the intention of Congress in Section 203(d) [of the Act] into a practicable and equitable standard of exemption from wage controls." 347 F.Supp. at 417.

According to the affidavit of Dr. Marvin Kosters filed in support of defendants' opposition to the motion for preliminary injunction, COLC, in arriving at the $2.75 per hour exemption limit, used eight computational alternatives with each of those broken down further to take into account different assumptions on the length of the average work week and the average work year.[4] Each alternative had as its first computational step the $7,214 Autumn 1971 Bureau of Labor Statistics lower budget applicable to a four-person urban family headed by a wage earner, aged 35–54.[5] This was in keeping with the legislative history of Section 203(d) of the Act which makes clear "[T]hat Congress requires an exemption from wage controls for individuals whose earnings are below budget levels established by the Bureau of Labor Statistics (BLS)." 347 F.Supp. at 414. COLC first adjusted the $7,214 figure by adding $144 for cost of living increases since Autumn 1971 with the result that the adjusted lower budget is $7,358 in the case of each of the eight computational alternatives used by COLC.

The BLS lower budget was developed to show the total annual income needed to meet the cost of living expenses for

4. Dr. Kosters, an economist, is the assistant director for planning and analysis for COLC. He and his staff were primarily responsible for the economic analysis upon which COLC based its July 25, 1972 decision that effective July 15, 1972, the wage rate of $2.75 per hour should be used in implementing Section 203(d) of the Economic Stabilization Act of 1970, as amended. (Koster affidavit.)

5. The eight computational alternatives are set forth in Table 3 of Exhibit A to the Koster affidavit.

an urban family of four headed by a wage earner 35 to 54 years of age. In order to determine primary family [6] incomes from collected data, COLC turned to "Household Income in 1970 and Selected Social and Economic Characteristics of Households," Bureau of Census, *Current Population Reports*, Series P–60, No. 79, July 27, 1971. Table 4 of that publication [7] breaks down total household income into dollar amount intervals (including a mean figure for all primary family household families) which are plotted in column and row fashion against income of the head only, once again broken down into dollar amount ranges. The mean income figure from that 1970 table of primary family households which is closest to the Autumn 1971 BLS lower budget of $7,-214 is $6,820. The range of income of the head only corresponding to that $6,-820 figure is from $4,000 to $4,999. For those cases of less average family income, there was a correspondingly lower income for the head of the family.

In order to estimate income available to such primary family households, other than that received by the head, COLC took the difference between the average income interval, shown as "Mean Income (Dollars)" in Table 4, and the midpoint of the relevant income range of the head of the household only, shown in Table 4 as "Income of Head." The average of the differences, weighted by the proportional distribution of households falling in each income range of the head only as shown in Table 4, was computed. The resulting average household income, other than through income of the household head, was $2,281. In all eight of COLC's computational alternatives this $2,281 average household income [8] figure, representing average income other than that of the household head, was subtracted from the BLS Autumn 1971 lower budget as adjusted for cost of living increases since Autumn 1971.

In the first computational alternative COLC did nothing more than subtract $2,281 from $7,358, the lower budget adjusted for cost of living increases. The result was $5,077 as the annual income of a family head necessary for the average low-income family to attain the BLS lower budget level of family income. The hourly wage required to produce that annual income would be $2.74, assuming a 37 hour week, 50 week work year. If the head of the family worked a 37 hour, 52 week work year, the hourly wage would be $2.64.

COLC made three other adjustments to the $5,077 lower budget figure obtained in the first computational alternative. These three adjustments were combined with one another in the seven mathematically possible combinations, each of which formed the basis for one of the seven remaining alternative computations.

The first of these other adjustments was a downward one of $115 in the $5,-077 lower budget figure to reflect a reduction in 1972 of federal income taxes for a family of four in the relevant income intervals.

6. "The term 'primary family' refers to the head of a household and all other persons related to the head by blood, marriage, or adoption." p. 6, Bureau of the Census, Current Population Reports, Consumer Income, P–60, No. 80, October 4, 1971.

7. Table 4 is set forth as Table 1 of the Koster affidavit.

8. The Bureau of the Census includes as income:
   1) money wages or salary
   2) net income from nonfarm self-employment
   3) net income from farm self-employment
   4) social security payments
   5) dividends, interest (on savings or bonds), net rental income, etc.
   6) public assistance or welfare payments
   7) unemployment compensation, workmen's compensation, etc.
   8) private pensions, annuities, etc.
   P. 4, Bureau of the Census, *Current Population Reports, Consumer Income*, P. 60, No. 80, October 4, 1971.

In the second adjustment, $107 was added by COLC to the $5,077 lower budget figure to reflect additional work related costs to families with incomes of less than $7,000 per year. For the purpose of this computation, COLC accepted the 1.09 wage earners per low-income family contended for by the plaintiffs in July 1972. See 347 F.Supp. at 416.

The final additional adjustment was a downward one of $280 from the lower budget figure to reflect an average family size of 3.8 persons, instead of the 4 persons assumed in the BLS family. COLC now considers the 3.8 figure as a more appropriate and reasonable estimate of family size than the 3.6 estimate it contended for in July 1972. See 347 F.Supp. at 415–416.

The annual income of a family head necessary for the average low-income family to attain BLS lower budget level of family income ranged through the application of the eight computational alternatives from a low of $4,682 to a high of $5,184. The hourly wage for a 37 hour week 50 week year ranged from $2.53 to $2.80 and for a 37 hour week 52 week year the range was from $2.43 to $2.69. The hourly wage rate for a 40 hour week 50 week year ranged from $2.34 to $2.59 and for a 40 hour week 52 week year the hourly rate ranged from $2.25 to $2.49.

In making its final selection of what it considered to be an appropriate substandard wage exemption level, COLC decided that $2.75 an hour was a most reasonable figure, which was at the upper end of the range of the alternative hourly rates considered by COLC and "was consistent with both the intent of Congress as stated in Section 203(d) and with the Council's mandate as expressed in the Economic Stabilization Act in its entirety." (p. 5, Koster affidavit.) Herbert Stein, Vice Chairman of the Cost of Living Council, in an affidavit filed in support of defendants' opposition to the motion for preliminary injunction, states that the members of COLC "determined that implementation of a $2.75 exemption level satisfied the Congressional mandate of § 203(d) in a manner consistent with the goals and purposes of the economic stabilization program."

In considering whether the setting of a $2.75 exemption level comes within the statutory authority conferred on the Executive, it is well to remember what this Court has previously said: "Unquestionably, the Executive must have some discretion in implementing administratively the broad directive of Congress in Section 203(d). Congress has not pre-empted the exercise of discretion with any detailed definitions of the crucial terms of that provision. But Congress has provided a mandatory level of exemption which should not be undermined in the interest of administrative convenience." 347 F.Supp. 414–415.

The main thrust of plaintiffs' challenge to the validity of the $2.75 exemption level is that COLC undermined the Congressional mandated level of exemption when it considered total household income in determining the level of earnings of the head of the household that would be required to meet the BLS lower budget as adjusted for increase in living costs. Plaintiffs contend that the authority of COLC was limited to determining the BLS lower budget as adjusted and then computing an hourly wage for a year's work by one wage earner that would produce that amount. That, they assert, is what the clear meaning of Section 203(d) requires.

As has been heretofore found by this Court, it was the intention of Congress in enacting Section 203(d) to exempt from wage controls all persons whose earnings are at or below levels established by the Bureau of Labor Statistics in determining "an income necessary to afford adequate food, clothing and shelter and similar necessities" for an urban family of four. 347 F.Supp. 412–414. When COLC promulgated its invalid $1.90 wage exemption level it included in its computation the earnings of 1.7 wage earners per family. It subtracted an amount from the BLS budget representing the earnings of the addi-

tional .7 of a worker and added an amount to the budget as representing additional family costs because of that .7 worker. This Court upheld the challenge of plaintiffs that there were not 1.7 wage earners in a family with income of less than $7,000 but rather, as plaintiffs contended, there were 1.09 wage earners in such a family. 347 F.Supp. 416.

■ As in the case of the COLC invalid $1.90 exemption level computation, that agency in determining the $2.75 exemption level took into consideration family income. Here, however, it did not limit its approach to family income resulting from wages but rather considered all family income data as defined and collected by the Bureau of the Census. See n. 8, supra, and accompanying text. Since the BLS lower budget is not based on earnings from wages but rather on costs for adequate food, clothing, shelter and similar necessities and income from whatever source necessary to provide for the same, it cannot be considered irrational for COLC to consider all family income including but not limited to income from wages. This Court rejects plaintiffs' contention that the wage exemption level must be such that the annual income from wages for one wage earner alone must be sufficient to afford adequate food, clothing, shelter and similar necessities.

Plaintiffs also contend that COLC, in deciding on a $2.75 wage exemption level, "assumes such an exemption level satisfies Section 203(d) because families, not individuals, are exempted." And plaintiffs cite this Court's earlier opinion that "Congress did not exempt all

families from wage controls; it exempted individuals whose earnings are substandard and those who are members of the working poor." 347 F.Supp. at 416. But in exempting such individuals Congress, through the legislative history, directed the Executive to consider the working poor as constituting "a family of four living in an urban area of 2,500 population or more and having an annual income of $6,960. or less." 347 F.Supp. at 413. Thus there is a rational basis for COLC to turn to the BLS lower budget to determine the amount of income necessary to supply the necessities contemplated by that budget and the sources of income available to meet those necessities. The individual's exempted wage is the difference between the amount of income necessary to meet the budget requirements and income of the family other than the earnings of the head of the family. If the Congress meant something different it was competent to say so. Indeed the Senate bill, which was rejected in conference, did just that. See 347 F.Supp. at 412–413.[9]

Plaintiffs also complain of COLC's "reduction to $107 for 'work-related costs of other family members' from the earlier $820 figure." The plaintiffs are referring to the prior invalid $1.90 wage exemption and the .7 of a wage earner that in part brought about that exemption. In the earlier computation $2,774 was subtracted from the BLS budget as representing the earnings of an additional .7 of a worker per average family and $820 was added to the budget for the additional expenses of .7 of a worker. In the earlier opinion the assumption of 1.7 earners per family whose income was $7,000 was rejected and it was stated

9. While not necessarily pertinent, it is interesting to note that a "total consumption" budget for the BLS lower budget family totals $5841. The same budget for a single person under 35 years is $2040. To the lower budget family $5841 must be added $1373 which consists of taxes ($1,016) and "other items" ($357) which brings the BLS lower budget family up to $7214 as of Autumn 1971. If the same amounts were to be added to the single person under 35 years budget, the total lower budget for such an individual as of Autumn 1971 would be $4413. That budget would be approximately at the $4500 mid-point of the $4,000-$4,900 head's income interval as shown in Table 4. For budget figures, see U.S. Dept. of Labor, Official Information April 27, 1972 Release, U.S.D.L.—Bureau of Labor Statistics—72–240.

that the average number of earners was 1.09. 347 F.Supp. at 416. In the present computation COLC has taken the 1.09 wage earners per family and has added $107 to the budget for the additional expenses of .09 of a worker. While plaintiffs do not challenge the addition to the budget,[10] they do contest the failure of COLC to reduce the earnings in the computation. In other words, they assert that while it is proper to reduce the additional expense from $820 for .7 of a wage earner, the COLC failed to reduce the earnings of the .7 worker from $2,774 to $360.62 for the .09 worker, but instead the agency credited the .09 worker with earnings of $2,281. The fallacy in the plaintiffs' argument is that once again they fail to recognize that the $2,281 family income, other than the earnings of the head of the family, comes from several sources besides wage earnings according to the Bureau of the Census. See n. 8, *supra.*

Plaintiffs further challenge the $2.75 exemption level on the ground that COLC, in adjusting downward the BLS lower budget, Autumn 1971, as increased for cost of living increases, improperly computed family income, other than the earnings of the head of the family, as being $2,281. According to plaintiffs this error resulted from the application of mean income data by COLC in its computation instead of median income data. This contention and defendants' counterargument are essentially a disagreement between the parties as to the appropriate statistical approach. Each side in support of its respective position has not only argued the question at length but has also submitted extensive affidavits by an economist. To set forth with particularity those arguments and the statistical data relied on would unduly and unnecessarily lengthen this opinion.

To understand the conceptual differences of the parties requires in the beginning a definition of terms.

"The mean income is the amount obtained by dividing the total income of a group by the number of units in that group x x x." (p. 5, Bureau of Census, *Current Population Reports, Consumer Income,* P–60, No. 80, October 4, 1971.)

"The median income is the amount which divides the distribution into two equal groups, one having incomes above the median and the other having incomes below the median." (p. 5, Bureau of Census, *Current Population Reports, Consumer Income,* P–60, No. 80, October 4, 1971.)

Essentially plaintiffs contend that the deducted $2,281 family income, other than the income of the head, is a distorted figure since it was arrived at by arithmetic averaging which included households with total income ranging from $7,000 to $50,000 and over. Moreover, the plaintiffs assert that the mean family income approach results in nonexemption from wage control for 40.4% of households having total household income in the same interval as income for the head of the household alone (i. e., less than $1000 difference), and 57% of the households having total household incomes in the next interval above that of the income of the head alone (i. e., less than $2,000 difference). Thus, they contend that a $2,281 figure for other family income cannot be representative if at least 57% of all families do not receive that much extra income.

While maintaining their position that total family income should not be considered in determining an hourly wage rate exemption level, plaintiffs assert that, if it is to be considered, it should be median family income rather than mean family income. According to plaintiffs, if median data rather than mean data was used, the "other family income" to be deducted from the BLS lower budget would be $1,019 rather than $2,281 and the hourly wage rate

10. Plaintiffs do not complain of the additional expense to the budget but they do the amount. COLC acknowledges that by a mathematical mistake $107 was added when it should have been $108.50.

exemption, based on a 37 hour 52 week work year, would be $3.41 instead of $2.75, based on a 37 hour 50 week work year.

Defendants counter plaintiffs' argument by asserting that the use by COLC of mean data has resulted in an exemption level that fairly represents the low income family population. They recognize that the use of mean data results in a large fraction of low income families having incomes below the low-budget level because income, other than that of the head, is unevenly distributed among families. But they contend, and support their contention with a showing by their economist, that the same situation would exist if median data were utilized.

In challenging the median data concept espoused by plaintiffs, defendants point out that it is only with respect to "other family income" that plaintiffs apply median data; they use mean data in applying their formula when it concerns family size, hours worked per week and weeks worked per year. To mix mean and median data is neither consistent nor logical assert the defendants.

Defendants' average (mean data) low income family numbers 3.8 members where the head is under 65 years of age and it has used that figure in establishing the $2.75 hourly wage exemption. If median data had been used, such a family would have numbered 3.5 members. The use of the median 3.5 family would result in a $699 deduction from the cost of living adjusted BLS lower budget, Autumn 1971, instead of the $280 deduction for the mean 3.8 family. If only families with incomes under $7,000 were to be considered the mean size would be 3.2 and the median size would be 2.6. $1,972 would be deducted from the mentioned budget in the case of the median size family with incomes under $7,000 while that deduction would be $1,118, in the case of the 3.2 mean size family. In this connection, it is to be noted that, at the time this Court declared the $1.90 hourly wage exemption

illegal, it was the plaintiffs who argued for the 3.8 "average family size" whose head is under 65. 347 F.Supp. at 416.

Moreover, it was plaintiffs who heretofore contended for an "average work week of 37 hours." 347 F.Supp. at 417. But defendants have submitted evidence to show that the median work week is 40 hours. And data submitted by defendants discloses that in 1970 the heads of approximately 33,000,000 families out of 52,000,000 families worked at full-time jobs 50 to 52 weeks a year. In contrast to the $3.41 hourly wage rate exemption claimed by plaintiffs as a result of their mixing mean and median data with the resulting 37 hour 50 week work year computation, the defendants' computation of the hourly wage exemption level by the use of median data only ranged from $2.10 to $2.82. In that computation the median data of a 40 hour 50 week work year was used by defendants in some instances and a 40 hour 52 week work year was used in others.

█ The $2.75 hourly wage exemption rate promulgated by COLC on July 25, 1972, compares favorably with the rates computed by use of median data. This Court cannot say here that the $2.75 exemption rate lacks a rational basis.

█ To sustain COLC's application of the Economic Stabilization Act of 1970, as amended, does not require this Court to find that agency's construction of the Act is the only reasonable one, or even that this Court would have reached the same result if the question had arisen in the first instance in judicial proceedings. Unemployment Comm'n v. Aragon, 329 U.S. 143, 153, 67 S.Ct. 245, 91 L.Ed. 136 (1946), Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), Udall v. Washington, Virginia and Maryland Coach Co., 130 U.S.App. D.C. 171, 175, 398 F.2d 765, 769 (1968), cert. denied, Washington Metropolitan Area Transit Com. v. United States, 393 U.S. 1017, 89 S.Ct. 620, 622, 21 L.Ed.2d 561. In a case such as this the "judicial function is exhausted when there is found to be a rational basis for the con-

clusions approved by the administrative body." Miss. Valley Barge Co. v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 694, 78 L.Ed. 1260 (1934), Udall v. Washington, Virginia and Maryland Coach Co., id. Thus the July 25, 1972 amendment of Cost of Living Council Regulation Sec. 101.104 setting a $2.75 hourly wage rate exemption is held to be valid. Defendants' motion for summary judgment will be granted and that of plaintiffs will be denied.[11]

*July 14, 1972 Court Ruling: Retroactive or Prospective*

■ Ten days after this Court held invalid COLC's $1.90 hourly wage exemption regulation, the defendants filed a motion to amend that order to make it only operate prospectively. Thereafter defendants requested the Court to defer decision on the retroactivity issue unless and until the $2.75 exemption level was declared valid. Since the validity of that exemption level has been declared, it is proper that this Court at this time consider and decide the retroactivity question.

With respect to this matter it must be again recalled that this Court's jurisdiction is very limited. Section 211(d) (2) of the Economic Stabilization Act of 1970, as amended, authorizes this Court in a proper case to enjoin the application of a COLC regulation "to a person who is a party to litigation before it." The July 14, 1972 order of this Court granted a summary judgment in favor of the plaintiffs and plaintiff-intervenors and enjoined the application as to them of COLC Regulation Sec. 101.104 providing the $1.90 exemption level. So far as that order of this Court is concerned, no one else is affected.[12]

In support of their motion to amend the July 14, 1972 order to make it apply only prospectively, defendants argue that as a result of the July 14, 1972 declaration of invalidity the $1.90 exemption level regulation is void ab initio and that, therefore, there was no wage exemption for the working poor from the date of the amendatory act, December 22, 1971, until a valid exemption regulation was promulgated—that is, until July 25, 1972, the date of the now declared valid $2.75 exemption level regulation. During that period, December 22, 1971 to July 25, 1972, defendants contend that the working poor's wages were subject to the 5.5 percent increase regulation.

Defendants assert that if this Court was to make its July 14, 1972 order retroactive the Government's economic stabilization program would be seriously if not disastrously undermined. In an effort to support this argument they have filed a July 22, 1972 affidavit of the Chairman of the Pay Board. That affidavit is essentially a statement of generalities and conclusions. Counsel for defendants at the November 29, 1972

11. Plaintiffs, in support of their motion for summary judgment, submitted extracts from a December 14, 1972 Report of the Joint Economic Committee, Congress of the United States. On pages 6–7 of that Report it is stated that all workers earning less than $3.50 per hour should be exempt from wage controls. It is not for this Court to declare who should be exempt if the Executive agency to whom the Congress has delegated the power to exempt has not acted arbitrarily or in excess of statutory authority. If Congress desires the hourly exemption rate to be $3.50 or any amount it is competent to so legislate it. It has done so in the past. See Defense Production Act, as amended, Pub.L. 774, 64 Stat. 798, Chap. 932, 81st Cong., 2d Sess., Sept. 8, 1950, as amended,

Pub.L. 429, 66 Stat. 296, Chap. 530, 82nd Cong., 2d Sess., June 30, 1952.

12. While only plaintiffs and plaintiff-intervenor Meat Cutters are parties to the supplemental complaint and, therefore, are affected by the order of this Court granting summary judgment in favor of defendants and this $2.75 exemption level regulation, they along with plaintiff-intervenors Meany and AFL-CIO were the parties in whose favor the July 14, 1972 summary judgment and injunction were entered. This part of the opinion, dealing with the question of retroactivity, applies to plaintiffs, plaintiff-intervenor Meat Cutters, and plaintiff-intervenors Meany and AFL-CIO.

hearing on the then pending motions acknowledged that the affidavit had been drafted in haste after this Court's July 14, 1972 order before the COLC and Pay Board had analyzed its implications. "At the time that was drafted, the feeling was that it was going to cause chaos over there." p. 10, Tr. Nov. 29, 1972 hearing. In fact, as defendant's counsel candidly admitted, the affidavit in some parts was not correct. But now counsel in a supplemental brief contend that that affidavit shows that "retroactivity would produce three major inequities to employees."

First, it is claimed that retroactive application of this Court's July 14, 1972 order would result in inequities between organized employees who were earning less than $2.75 per hour but who had bargained for more than a 5.5 percent increase and organized employees at similar wage levels who bargained only for a 5.5 percent increase. While the affidavit does make such a general statement, it gives no clue as to the number of employees in each group. Furthermore all employees' organizations in entering into collective bargaining agreement were or should have been aware that the Pay Board's regulations did not prohibit agreements that provided for more than a 5.5 percent pay increase. What was prohibited was the payment of increases in wages without Pay Board approval. 6 C.F.R. § 201.17 (1972). The working poor should not be penalized because some labor organizations did not bargain for more than a 5.5 percent increase. Moreover, the very inequities that defendants assert would result from the retroactive application of this Court's July 14, 1972 order have at least in some cases been effected prior to July 14 by the Pay Board itself. Paragraph 5 of the Pay Board Chairman's affidavit states that that agency gave "special consideration to low paid employees beyond the $1.90 exemption" and the Chairman cites one case where the increase amounted to 14 percent. Of course, there would have been no increase if the collective bargaining did not provide for it.

Second, it is further contended that the retroactive application of this Court's July 14, 1972 order would effect inequities between organized employees who were earning less than $2.75 per hour who bargained for more than a 5.5 percent increase and unorganized employees at similar wage levels. In essence what defendants assert here is that since organized employees have greater economic strength than the unorganized, all working poor, whether or not organized, should be denied what was legally theirs—the protection from the economic hardships that Congress gave to all working poor.

Third, retroactivity would produce inequities flowing from the disturbance of historic employer tandem relationships. Paragraph 11 of the Pay Board Chairman's affidavit states: "A typical tandem relationship involves a unit of hourly production employees whose wages are determined by a collective bargaining agreement, and a unit of salaried supervisors whose level of pay is subsequently established. In many cases, the hourly paid unit could receive a further increase, within the general guidelines, because of the retroactive change in the working poor exemption, while the tandem-claiming unit, with pay rates above the working poor level, could not maintain its historical differential within the same guideline." In their argument against retroactivity defendants are silent as to the effect of the $2.75 per hour level since July 14, 1972, on that historic tandem relationship. Either that relationship has been disturbed or the salaried supervisors' pay has been adjusted. But whatever may have happened prospectively to that relationship, equity speaks in a falsetto voice when it argues that the tandem relationship is so sacrosanct that its disturbance is to be avoided even to the extent of denying the working poor, between December 22, 1971 and July 15, 1972, a level of earnings sufficient to extricate them from that status.

Finally defendants argue that to make the July 14, 1972 order of this Court retroactive would be inequitable to employers since their products were priced to meet a $1.90 hourly wage level rather than a $2.75 hourly rate. Particularly should the employers not be penalized, argue the defendants, since it was the illegal action of the COLC that misled those employers. But COLC promulgated the $1.90 regulation after having its attention called to the questionable legality of that action. The Pay Board, pursuant to a request of COLC, on January 19, 1972, advised the latter that the $1.90 figure was "inconsistent with the purposes of the Amendments to the Economic Stabilization Act and supporting analysis." See Jennings v. Connally, 347 F.Supp. 409, 411, n. 6. While it was on January 29, 1972, that COLC determined that it was wages under $1.90 an hour that were to be exempted, it was not until February 24, 1972, that the invalid regulation was issued. *Id.* But before the promulgation of that regulation this action was instituted on February 3, 1972, challenging the validity of the $1.90 figure. To say now that the working poor, among the economically weakest citizens, should bear the costs of defendants' error does not sound in equity. Whatever harm that may have been suffered by employers as a result of COLC's illegal action is a matter which the latter should rectify with those employers.

■ Equity does not deny retroactivity and the law permits it as evidenced by Addison v. Holly Hill Co., 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944). That was an action brought by the employees against their employer Holly Hill Company for wage payments under the Fair Labor Standards Act. The employees had been denied the claimed wages because of a regulation promulgated by the Administrator of the Wage and Hour Division of the Department of Labor which exempted them from the minimum wage and overtime requirements of the Act. The Court held that the regulation was invalid because the Administrator exceeded his statutory authority. The case was remanded to the District Court with instructions to hold it until the Administrator acted within the authority given him by Congress and made a valid determination of the persons exempted from the Act. The Court, in recognizing that its disposition of the case would apply retroactively, stated (322 U.S. 620, 622, 64 S.Ct. at 1223):

The accommodation that we are making assumes, what we must assume, that the Administrator will retrospectively act as conscientiously within the bounds of the power given him by Congress as he would have done initially had he limited himself to his authority. To be sure this will be a retrospective judgment, and law should avoid retroactivity as much as possible. But other possible dispositions likewise involve retroactivity, with the added mischief of producing a result contrary to the statutory design.

. . . . . .

In short, the judicial process is not without the resources of flexibility in shaping its remedies, though courts from time to time fail to avail themselves of them. The interplay between law and equity in the evolution of more just results than the hardened common law afforded, has properly been drawn upon in working out accommodating relationships between the judiciary and administrative agencies. And certainly in specific cases, such as those already referred to and in this, it is consonant with judicial administration and fairness not to be balked by the undesirability of retroactive action any more than courts have found it difficult to sanction legislative ratification of acts originally unlawful, United States v. Heinszen & Co., 206 U.S. 370, 27 S.Ct. 742, 51 L.Ed. 1098, 11 Ann.C. 688; Chuoco Tiaco v. Forbes, 228 U.S. 549, 33 S. Ct. 585, 57 L.Ed. 960; Graham & Foster v. Goodcell, 282 U.S. 409, 51 S.Ct. 186, 75 L.Ed. 415; Hirabayashi

v. United States, 320 U.S. 81, 91, 63 S.Ct. 1375, 1381, 87 L.Ed. 1774, or retroactively to give prior legislation new scope.

See also SEC v. Chenery, 332 U.S. 194, 203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), Manhattan General Equipment Co. v. Commissioner, 297 U.S. 129, 134, 56 S.Ct. 397, 80 L.Ed. 528 (1936). Cf. Retail, Wholesale Department Store Union v. NLRB, 466 F.2d 380 (D.C.Cir. 1972).

■■■ Defendants' motion to amend or clarify this Court's July 14, 1972 order to have it apply only prospectively is denied. The July 25, 1972 promulgated regulation, providing a $2.75 per hour wage exemption level, being the first and only legal regulation implementing Section 203(d) of the Economic Stabilization Act of 1970, as amended, will be applied by defendants prospectively from December 22, 1971 with respect to plaintiffs, plaintiff-intervenor Meat Cutters, and plaintiff-intervenors Meany and AFL–CIO.

*Plaintiffs' and Plaintiff-Intervenors' Motion for Temporary Relief*

■■■ Following this Court's July 14, 1972 order declaring invalid the $1.90 per hour wage exemption for the working poor, plaintiffs and plaintiff-intervenors requested this Court to enter an order placing a $3.35 exemption level in effect until such time as defendants issued a new regulation setting an exemption level of at least $3.35 for the working poor. This motion will be denied for two reasons. First, this Court's limited jurisdiction would not permit it to enter such an order even if it were so inclined. Section 211(d) of the Economic Stabilization Act of 1970, as amended. Secondly, this Court has found the regulation providing a $2.75 per hour wage exemption level for the working poor

valid and is ordering it to be applied from and after December 22, 1971.

Pursuant to the findings and conclusions of this opinion, an appropriate order will be entered.

### ORDER

This action having come before the Court on cross-motions for summary judgment, and on plaintiffs' and plaintiff-intervenors' motion for additional temporary relief, and the Court having considered the memoranda and affidavits filed in support of and in opposition to the motions and having heard argument of counsel and having filed an Opinion in this case, it is this 1st day of March, 1973,

Ordered

1. That the motion of the plaintiffs and plaintiff-intervenors for summary judgment be and is hereby denied;

2. That the motion of the plaintiffs and plaintiff-intervenors for additional temporary relief from this Court's July 14, 1972 Order be and is hereby denied;

3. That the motion of the defendants for summary judgment be and is hereby granted;

4. That the motion of the defendants to amend or clarify this Court's July 14, 1972 Order to have it applied prospectively only be and is hereby denied; and

5. That Cost of Living Council Regulation § 101.104 (37 Fed.Reg. 14998, July 27, 1972) is hereby declared to be the first and only legal implementation of Section 203(d) of the Economic Stabilization Act of 1970, as amended, and will be applied by defendants prospectively from December 22, 1971, with respect to plaintiffs, plaintiff-intervenor Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO, and plaintiff-intervenors George Meany and American Federation of Labor and Congress of Industrial Organizations.